REEVES *v.* MOORE.

Opinion delivered December 9, 1912.

1.  BOUNDARIES—PAROL AGREEMENT.—Where there is doubt, dispute or uncertainty as to the true location of a boundary line, the parties may by parol fix a line which will, at least when followed by possession with reference to the boundary so fixed, be conclusive between them, although the possession is not for the full statutory period. (Page 605.)

2.  WATERS AND WATER RIGHTS—ACCRETIONS—APPORTIONMENT.—Accretions to several sections of land should be apportioned by giving to each section a proportion of the outer boundary line of the accretions in the ratio that the old shore line on the particular section bore to the whole of the old shore line, and then drawing lines from the points of division, thus made in the outer boundary line, to the points at which the old shore line is intersected by the boundaries separating the different sections. (Page 606.)

3.  APPEAL AND ERROR.—HARMLESS ERROR.—One can not complain of error in his favor. (Page 607.)

Appeal from Lee Chancery Court; *Edward D. Robertson,* Chancellor; affirmed.

*Jacob Fink, P. D. McCulloch, W. W. Hughes,* and *Rose, Hemingway, Cantrell & Loughborough,* for appellant.

1.  A conventional boundary, acquiesced in for many years, is binding on the parties. 71 Ark. 248; 75 *Id.* 395; 96 *Id.* 168; 96 Ark. 168.

2.  Moore is estopped by his conduct to deny his acquiescence. 64 Ark. 628; 75 *Id.* 400; 91 *Id.* 148.

*P. R. Andrews* and *H. F. Roleson,* for appellee.

1.  A guilty party can not raise the question of fraud or misrepresentation in a court of equity. 37 L. R. A. 593; 4 Houst. (Del.) 119; 54 Cal. 189; 107 Ill. 302; 69 Tex. 509; 51 Minn. 300; 21 L. J. Chy. (N. S.) 563; 46 N. W. 540, 18 Minn. 470; 55 Ark. 299; 76 Atl. 331; 122 N. W. 1044; 107 *Id.* 478;

2.  Negligence or laches does not estop where the signature to a contract was obtained by trickery or fraud. 100

Pac. 117; 95 *Id.* 490; 89 *Id.* 325; 47 Ark. 335; 42 N. E. 1128. Asserting a belief is the assertion of a *fact*; and, if done with a fraudulent intent, it is fraudulent. 18 Am. St. 456; 55 *Id.* 824; 12 *Id.* 206; 34 Wis. 52. Nondisclosure of facts, where it is the duty of a party to speak, is a ground of avoidance of a contract. 37 Am. Dec. 725; 47 *Id.* 447; 67 *Id.* 195.

3. A person is entitled to relief from a fraud based on a positive false representation intended to be relied upon and deceive. 14 A. & E. Enc. 122; 5 Am. Dec. 167; 22 Am. St. 407; 47 Ark. 165, 335.

4. There is no estoppel. 56 Ark. 360; 71 Ark. 614; 75 *Id.* 72; 82 *Id.* 226.

5. To entitle an owner to accretions, there must be a natural and actual continuity of accretion to his land. 145 S. W. 840; 37 Cent. Dig., § § 266-279; 127 N. Y. S. 949.

SMITH, J. Appellant, who was the plaintiff below, filed his complaint in the chancery court of Lee County on September 12, 1907, and alleged that on April 4, 1899, he and the defendant, John P. Moore, entered into a contract whereby, for the consideration of $600, the said Moore sold and conveyed to plaintiff the privilege of cutting and removing from his land at Walnut Bend, Arkansas, the ash, cypress, cottonwood, oak, walnut, and sycamore timber on certain described lands and the accretions thereto; the lands being described as follows: the southeast quarter of the southwest quarter and the southwest quarter of the southeast quarter of section 6; sections 7, 8, and 17 and accretions thereto; and section 9; and the east one-half of southwest quarter of section 9, all in township 2, range 6.

The contract further provided that this privilege and sale by agreement was to continue for the term of five years, but the right to cut and remove the timber was to cease at the end of five years. That later for the additional consideration of $100 the contract was amended to include the elm trees. The amendment was dated December 27, 1899.

Plaintiff further alleged that, being unable to remove the timber within the prescribed time, he entered into another contract with the said Moore, under date of June 8, 1901, whereby, for an additional consideration of $250, be bought the privilege of cutting and removing from the lands described

in the first contract, above mentioned, all the young sapling cottonwood trees, and, in addition, there was given ten years' time in which to cut and remove the young cottonwood saplings and the other contract was extended to expire ten years from the said 8th day of June, 1911. That the contracts were recorded, although they were never acknowledged. That in making the contracts Moore represented that the accretions embraced a certain tract of land, which, subsequently, was adjudged to belong to one Dan Martin, in a suit for its possession, determined in the Lee Circuit Court, and also the accretions to section 20, and the accretions south of sections 21 and 22 to the river. That, since selling said timber to the plaintiff, the said Moore has procured a deed to the lands last above described from one Dan Martin, and is now attempting to set up his newly-acquired title against his timber deed to the plaintiff; that all of the title which Moore had acquired by his deed from Martin inures to the plaintiff's benefit.

The complaint further alleged that the said Moore had entered into a fraudulent conspiracy with his son and co-defendant, Frierson Moore, whereby, for a fictitious consideration of $40,000, the said Moore had conveyed all of the land in controversy and had caused his deed therefor to be recorded.

Plaintiff prayed that defendants be enjoined from conveying or incumbering plaintiff's timber rights, and that the deed to Frierson Moore be set aside as fraudulent, and that the defendant, John P. Moore, be required to give plaintiff a deed properly acknowledged, to the end that it might be recorded.

On September 18, 1907, plaintiff amended his complaint, alleging that at the time of the execution of the deed to him, set up in the original complaint, Moore was claiming to own the large body of land contiguous to the lands specifically described, as accretions thereto, and the plaintiff purchased in reliance upon the representations of said Moore; that he owned said lands and was selling the timber thereon; and that, by reason of said representations and his reliance upon them, the title acquired by the said Moore in his deed from Martin passed to the plaintiff; that defendant's said purchase inures to plaintiff's benefit; and he prays that he also be decreed to

have the right to cut and remove the timber from the lands conveyed by the said Martin to defendant.

Defendant, John P. Moore, answered, denying any understanding as to the extent of the accretions referred to in the contract or that any part of sections 20, 21, and 22 was included in the agreement; that all the lands in said section were acquired by him subsequent to his agreement with plaintiff; and that he made no representations to the plaintiff that anything in sections 20 or 21 or the accretions thereto was intended to pass by said deeds. And for further answer he said that he conveyed to his son, Frierson Moore, for the actual consideration of $40,000; and that his son had no knowledge of the existence of the timber contract in plaintiff's favor. He further alleged that he was an old man; that the lands were not easily accessible from the city of Helena where he lived; and that he had not been on them for more than twenty years, and knew nothing of the character or value of the timber growing thereon, while the plaintiff was advised and represented to him that there was only a very small amount of timber thereon, and that it was small in size and poor in quality and of little value, and induced him to convey said timber for a trifling part of its actual value; and that like misrepresentations were made by the plaintiff to secure an extension of the time and an amendment to the contract to include timber not originally included. Defendant tendered back the money which he had received, and asked that his contract with plaintiff be cancelled.

Frierson Moore answered on the same date his father did, and denied any knowledge of plaintiff's rights, and alleged that he had paid $40,000 for the lands.

Plaintiff filed notice of *lis pendens* September 12, 1907.

The record is a voluminous one, but the evidence will be stated briefly. The plaintiff was a sawmill man of wide experience, and was successfully operating upon an extensive scale. The defendant, John P. Moore, was a large land owner and a man of large wealth, but much advanced in age. It appears that to the lands in sections 7, 8, 17, 20, 21 and 22 vast accretions had formed, as to the extent of which neither plaintiff nor defendant appears to have had any very accurate conception at the time of their trade.

It further appears that some years before the first conveyance from Moore to Reeves a negro man, named Dan Martin, occupied and cleared a tract of land which Mr. Moore claimed to own, and for the possession of which he brought suit April 7, 1900, but this suit was determined adversely to him at the fall term of Lee Circuit Court, 1901. Moore's contention before and at the trial was that the land occupied by Martin was accretion to his land, while the judgment of the court sustained Martin's contention that it was an independent island. It is altogether probable that Reeves had no definite idea of the vastness of his purchase, and it is entirely certain that Moore did not know just what he was selling. The consideration paid proves, in comparison with the value of the timber sold, to have been only nominal, and even that price was not paid in cash. Neither party appears to have been in any need of money, but Reeves executed his note for the entire consideration of $600. None of the witnesses placed the value of the timber at less than $15,000, and one witness claimed to have negotiated a sale at $100,000, which was not consummated because of the controversy about the title. However, to a large extent, this disparity between consideration and value is accounted for by the fact that accretions continued to be made and cottonwood was shown to be a timber of extremely rapid growth and especially so in its sapling stage, and it appears further that in recent years very valuable commercial uses are made of cottonwood timber that was formerly not merchantable, because of its size.

We are not impressed with the contention made by the plaintiff that the defendant made any particular representation as to the lands upon which the timber was conveyed and in reliance upon which plaintiff purchased. In fact, plaintiff's contention in this respect, and the securing of ten additional years in which to remove the timber after having had nearly two years for that purpose, are the only circumstances which appear to give color to Moore's contention that Reeves knew what he was buying and deceived defendant to his disadvantage.

The chancellor set aside the deed from J. P. Moore to his son, Frierson, and the evidence fully warranted that action. It would be tedious and unprofitable to set out the evidence which leads to that conclusion, but it is reasonably certain

that this deed was executed, after Moore had discovered how poor a bargain he had made, for the purpose of avoiding its consequence.

It appears that the trade between Moore and Reeves was the consummation of negotiations pending between Moore and the negro, Dan Martin; that Martin had offered to buy the timber on the accretions to Moore's "Diamond place," which are the lands described as being in sections 6, 7, 8, 17, and 9, there being no accretions, however to sections 6 and 9. That Martin had no money and wanted to buy the timber by the thousand, but Moore appears to have disliked Martin, and to have been distrustful of him, and refused to sell the timber, except for $600 in cash. Martin, after several unsuccessful attempts to raise the money from other parties, finally applied to Mr. Reeves to either advance him the money or to buy the timber and let him log it. Both Moore and Reeves testified that the trade which was closed by the first contract was the identical one which Martin had attempted to negotiate; Reeves's evidence being that he took Martin's statement absolutely, and that he had no information, except that obtained from him. But he does say that Mr. Moore, in pointing out the lands on his map, swept his hand across the map to the river, saying that he owned all the lands and accretions indicated by his gesture, and which would include all the lands, the timber on which is here sued for. We think this evidence is not sufficient to sustain the allegations of plaintiff's amended complaint that Moore made representations about the extent of his accretions, upon which plaintiff relied and acted, and which defendant can not therefore now be heard to question. We reach this conclusion because the deed does not describe all the accretions now claimed, because the extent of these accretions has been unknown and their ownership to some extent uncertain; and because Moore denies that he sold any except that described; and because he did not then own all this land, although he may have claimed a part of it; and for the further reason that the description of the lands now claimed by appellant included Dan Martin's own land, and he of course had not offered to buy the timber on his own land. Appellant says that at the time of the first conveyance Moore claimed to be the owner

of the land, and claimed it as an accretion to his "Diamond place." It does appear that he attempted to recover the land from Dan Martin on that theory. As has been stated, he was unsuccessful in his attempt to do so, and we think that the plaintiff is in no position to take advantage of that fact. Accordingly, we hold that Reeves is entitled to the timber on the land specifically described in his contract; but when that conclusion has been reached, the case is still one of difficulty.

It appears that one Judge T. J. Ashley and a Mr. Beard owned sections 20, 21, and 22 and the accretions thereto, all of which were sold to Mr. Moore, subsequent to the date of the last contract, and that these lands, with the "Diamond place," comprise all the accretions to the main shore. The deed from Martin to Moore conveyed, not only the land which had been adjudged to be an island in the litigation, but also the lands which may have been an accretion to this island.

Appellant insists, and the proof tends to show, that about 1870 a line was run by agreement between Mr. Moore and Judge Ashley, who were then the owners, repsectively, of sections 17 and 20 and the accretions thereto. But the evidence as to this line consists of a deposition of Judge Ashley, taken in the case of Moore against Martin and read here as his deposition by the consent of the parties, and it does not fully appear just what the extent and purpose of this line was, farther than to mark the point up to which each might clear land, but it is not expressly stated in the deposition that they were apportioning the accretion between themselves. But, on the contrary, he makes the following statement in regard to the line and its purpose:

"Q. Where is the line between your and Moore's land? A. Running from the northwest corner of the original fractional section 20 straight to the river. Q. How was that line established? A. About the year 1870, by Mr. Bailey, as the surveyor of Phillips County at that time. Q. Was there any kind of agreement between you and Mr. Moore? A. (This question was objected to and not answered). (And on cross examination it appears that he testified as follows): Q. Mr. Ashley, about the line between you and Moore, is it not a fact, that there was no agreement at all, except along that Armstead line where he built? Moore cleared up to it

on one side and you on the other? A. Yes, sir. Q. You cleared up to a certain line and you recognized the line and he recognized it, A; Yes, sir; that is it. There was no other agreement. He cleared up to this line, and I cleared up to this line."

The recent case of *Malone* v. *Mobbs*, 102 Ark. 542, held that where there is doubt, dispute, or uncertainty as to the true location of a boundary line, the parties may by parol fix a line which will, at least when followed by possession with reference to the boundary so fixed, be conclusive between them, although the possession is not for the full statutory period. We adhere to this rule, but its application is not determinative of the question here considered. True, the the case quoted from was one where the accretions were apportioned, but in that case the accretions had entirely formed, and the law permitted and enforced a parol agreement to fix the boundary, because the very purpose of such agreement is to make definite and certain that which is uncertain and in dispute. Here there is no express showing that they were apportioning the accretions between themselves. And it affirmatively appears that at the time of the survey the accretions did not extend more than a half of a mile from their common corner, and a considerable part of this space was taken up by accretions, which were then in process of formation. In the deposition of Judge Ashley, before quoted from, he said:

"Q. When you came there in 1870, how far was the river from the line of these sections? A. About one-half of a mile. Q. How far is it down now? A. I expect probably a mile. Q. State what the character of the formation was? That is, how was it formed in the year 1870 till the time you left there? A. Formed by accretion. Q. In what way? A. By gradually making up the land."

At the present time there is land for more than a mile and a half from this common corner; but, if the line which Moore and Ashley agreed upon as a boundary was projected to the river, it would extend for a distance of a mile across land which was not in existence when the line was established, and there would be included the Dan Martin land and what may have been accretions to it. In other words, would include accretions which were probably made to an island. It appears

from the record in the suit against Martin that Moore sued for only 85 and 84-100 acres, but when Martin conveyed to Moore there was not only conveyed by its metes and bounds the land involved in that litigation, but also a large area of other lands which are the lands that Reeves said Moore represented he owned as accretions to his lands. But for Moore's purchase from Martin and from Ashley and Beard, there would be some question among them as to the apportionment of these accretions. It may have been that Moore bought from Martin only to acquire color of title to fortify himself in the future, in the defense of his possession, but, however this may be, there is too much uncertainty about the location and purpose of this conventional boundary to hold that it must be accepted as the boundary of the accretions for the benefit of one who knew nothing about it. The Mobbs case, above cited, is authority for holding that grantees may claim the benefit of the agreement of their grantors, and they need not have had knowledge of that agreement at the time of their purchase to claim the benefit; but we are distinguishing the facts of this case from the Mobbs case, and hold that Moore is not estopped from saying that Reeves should have only the accretions which were properly apportionable to the lands described in the conveyance to him.

It is necessary to determine how these accretions should be apportioned. The Mississippi River has entirely changed its course along the front of the lands under consideration; and to such an extent is this true that what was once the main river and the boundary between this State and Swearingen Island, which is in the State of Mississippi, has filled, until now in places it is only a chute, called "Old River," and the main river flows to the west of this island, placing it on the Arkansas side of the river. Appellant now insists that only the present shore of the Mississippi River should be taken into account and that the bank of Old River should not be measured in determining the present shore line, as was done by the master under the directions of the court in apportioning the accretions among the different sections of land. But we think that the court's directions to the master were proper, that is, that he should take, as the present shore line, the line running from the point where the accretions commenced to the point

where they ended, even though, in doing so, the present bank of the main stream was departed from when the measurements were made to extend along the bank of the Old River. To adopt the rule contended for by appellant would either leave some accretions unapportioned or would leave the accretions to section 7 in such a shape that the stream of Old River would divide its accretions into two disconnected parts. The rule adopted by the court below is in conformity with the rule announced in the case of *Malone* v. *Mobbs,* cited above, where the rule for apportioning accretions between coterminous proprietors is announced substantially as follows:

The accretions should be apportioned by giving to each section a proportion of the outer boundary line of the accretions in the ratio that the old shore line on the particular section bore to the whole of the old shore line, and then drawing lines from the points of division, thus made in the outer boundary line, to the points at which the old shore line is intersected by the boundaries separating the different sections.

In other words, each section should have a part of the outer boundary line in the same proportion to the whole of the outer boundary line that its proportion of the old shore line bore to the whole of the old shore line, with lines drawn from the respective dividing points on the old shore line.

In the case just quoted from, Judge HART, speaking for the court, said: "The rule just applied was the one generally recognized as the proper one to follow, unless there are such irregularities in the shore line as to make it inequitable, and this rule was there adopted as the one to be followed in this State, unless there are peculiar circumstances to modify it, as where the shore line happens to be elongated by deep indentations or sharp projections. The exception does not apply to the rule adopted by the court below.

It might be said that the above apportionment does not take into account the question of whether the land conveyed by Martin to Moore was accretion to the main land or to Martin's Island, but treats it all as if it were accretion to the main shore. But this is necessarily to the appellant's advantage, and appellee in his cross appeal makes no objection to this method.

Upon the whole case we are of the opinion that the decree of the chancellor is correct, and it is affirmed.